UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

S.G., A MINOR, BY AND THROUGH HIS PARENTS, J.C.G. AND J.G.,

Plaintiff,

v.

SAN DIEGUITO UNION HIGH SCHOOL DISTRICT, et al.,

Defendants.

Case No.:  3:22-CV-00450-JO-BLM

**ORDER DENYING S.G.'s MOTION FOR SUMMARY JUDGMENT, DENYING SAN DIEGUITO DISTRICT's FIRST MOTION FOR SUMMARY JUDGMENT, AND GRANTING SAN DIEGUITO'S SECOND MOTION FOR SUMMARY JUDGMENT**

Plaintiff S.G.[1] alleges that Defendant San Dieguito Union High School District ("San Dieguito District" or "the District") failed to provide him with special education services as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400 *et seq.*, and discriminated against him in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*  Both parties filed motions (1) appealing the administrative law judge's ("ALJ") decision regarding the special education services to which S.G. was

---

[1] As S.G. is a minor, his interests are represented by his parents, J.G. and J.C.G.  *See* Fed. R. Civ. P. 17(c).

entitled and (2) seeking judgment on his discrimination claims under the Rehabilitation Act.   For the reasons provided below, the Court denies S.G.'s motion for summary judgment, Dkt. 86 ("Pl.'s Mot. Summ. J."), denies San Dieguito District's first motion for summary judgment, Dkt. 83 ("Def.'s Mot. Summ. J. #1"), and grants San Dieguito District's second motion for summary judgment, Dkt. 93-1 ("Def.'s Mot. Summ. J. #2").

# I.   BACKGROUND

As this case centers on a child's attempts to access disability services from San Dieguito District, the Court begins by providing background information on the District's obligations to provide special education, S.G.'s disability and special education history, and the dispute that unfolded between them.

## A. San Dieguito District's Special Education Duties

The IDEA requires San Dieguito District to offer special education to children with disabilities.  *See* 20 U.S.C. § 1400(d)(1)(A).  The IDEA aims to ensure that every child with disabilities has meaningful access to education.  *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 73 (1999) (internal citation omitted).  To accomplish this goal, the IDEA provides federal funding to state education agencies (such as departments of education) and local education agencies[2] (such as county offices of education or school districts).  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993).  As a condition of receiving this funding, these entities must follow the IDEA's procedural and substantive requirements.  *Id.*  Because San Dieguito District is a local education agency that receives federal funding under the IDEA, it must comply with the IDEA in providing special education.  AR 169, 204.

San Dieguito District's principal duty under the IDEA is to provide all children with

---

[2]"Local educational agency or LEA means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 34 C.F.R. § 303.23.

disabilities in its jurisdiction with a free appropriate public education, commonly referred to as a FAPE. 20 U.S.C. § 1400(d)(1)(A). In order to meet this obligation, the District must ensure that students with disabilities receive a publicly funded education that both caters to their specific special educational needs and complies with state educational standards. *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 939 (9th Cir. 2017). To determine whether a child qualifies for special education, San Dieguito District must conduct a formal "evaluation" in which it examines the child in "all areas of suspected disability" by performing "assessments," which are tests that use a variety of methods to gauge the child's cognitive and behavioral issues. 20 U.S.C. §§ 1414(a)(1), (b)(2)-(3). The District is not only required to conduct an initial evaluation upon the parents' request or when it suspects a child may be disabled, but it also must reevaluate the child once every three years to reexamine his or her current functioning by conducting a "triennial" evaluation. *Id.* § 1414(a)(2)(B)(ii). If a child qualifies for special education, the District must then construct an individualized educational program or IEP, that details the student's academic functioning and annual goals as well as the District's proposed accommodations to help the student meet his or her objectives. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158–59 (2017). Critically, the right to a free appropriate public education is guaranteed to all children with disabilities—not just those enrolled in the public school system. 20 U.S.C. § 1412(a)(3)(A). Accordingly, San Dieguito District must also ensure that students with disabilities attending private schools within its borders are evaluated for special education and offered an IEP if they qualify. *See* 34 C.F.R. § 300.131.

In addition to providing special education services, San Dieguito District must also comply with certain procedural rules under the IDEA. The IDEA defines the processes by which school districts must (1) identify children with suspected disabilities, (2) conduct assessments (tests designed to evaluate children's disabilities), (3) evaluate their eligibility for special education, (4) confer with parents, (5) design IEPs, and (5) resolve disputes. 34 C.F.R. §§ 300.111, 300.304, 300.320, 300.322, 300.504, 300.510. To ensure that the child's interests are served throughout this process, the IDEA also establishes certain

protections for parents, referred to as "procedural safeguards," such as the right to participate in IEP meetings or review educational records. 20 U.S.C. § 1415(d)(1). In addition to securing these rights, school districts must also proactively inform parents of their procedural safeguards. *Id.* Accordingly, San Dieguito District must follow the IDEA's procedural requirements and standards, as these serve to ensure that every child with disabilities has "meaningful access" to education. *Cedar Rapids*, 526 U.S. at 73. Ultimately, if a student's parents believe that the District has failed to meet the substantive or procedural requirements of the IDEA, they have the right to file a due process complaint against the District before the California Office of Administrative Hearing. 34 C.F.R. § 300.508; Cal. Educ. Code § 56501.

One of San Dieguito District's central duties under the IDEA is to identify students with disabilities within its borders. *See* 20 U.S.C. § 1412(a)(3)(A). In meeting this obligation, the District is required to develop a practical method to find children with disabilities enrolled in both public and private schools within it geographic borders. *See* §§ 34 C.F.R. 300.111, 300.131. Specifically, the District must design a "Child Find" policy—a process for identifying, locating, and evaluating students in need of special education as well as for monitoring students who already are receiving special education services within the district. *See* 34 C.F.R. § 300.111; AR 309, 359, 1322. To fulfill this duty, San Dieguito District has a designated case manager, AR 5670–79, and a written policy, AR 3864–71. First, with regard to its Child Find policy for private schools, the District has a specific "private school case manager" who reaches out to all of the private schools within its jurisdiction. AR 5674. The case manager then inquires whether the private schools suspect that any of their students may have disabilities and particular special education needs. AR 5674–78. After obtaining this information, San Dieguito District reaches out to the parents to begin the next steps of evaluating their child. AR 5678–79. Second, in its written policy, the District details its process following a referral for special education instruction, explaining that the District must then (1) conduct an initial evaluation, (2) facilitate an IEP meeting, (3) determine the student's eligibility, and

(4) conduct a reevaluation if warranted.[3]  AR 3864–71.

**B. S.G.'s Disabilities and Educational Background**

Since he was a young child, S.G. has required specialized services for his mental and emotional disabilities.  When S.G. started exhibiting disability symptoms in preschool, his parents referred him for an initial evaluation with their local elementary school district, Del Mar Union School District ("Del Mar District").  AR 2469–71.  Following the evaluation, Del Mar District found S.G. disabled on account of his anxiety and attention deficit hyperactive disorder ("ADHD") symptoms and gave him an IEP providing an aide and extra support in the classroom.  AR 2515–31, 2695.  Consistent with his IEP, S.G. enrolled in kindergarten at his neighborhood school in Del Mar District and began his special education on March 27, 2012.  AR 2514–31.   For the next several years, Del Mar District continued to support S.G.'s special education needs, including by conducting his required "triennial" in 2015 to reevaluate his needs.  AR 2719–42.  Through March 2017, Del Mar District administered S.G.'s annual IEPs, which focused on aiding his learning given his ADHD and generalized anxiety.[4]  AR 2573, 2640, 2719, 2833, 2839–62.

S.G. remained enrolled in Del Mar District until 2017 when he started exhibiting serious behavioral problems.  At this time, his parents began to fear that he had a severe addiction to technology, and, on a more troubling note, had become a danger to himself, his family, and others at school.  AR 3208–12.  As a result, after completing fifth grade in 2017, the S.G.'s parents withdrew him from his elementary school and enrolled him at NewBridge, a private school located within Poway Unified School District ("Poway District") at their own expense.  AR 2864–65, 3025.  When S.G.'s parents informed Del Mar District of their unilateral decision to enroll him at a private school, the school district

---

[3] The school board approved and adopted the written policy on September 19, 2019.  AR 3871.

[4] As of his March 2017 IEP, S.G. was performing at grade level in reading and math and secure in both science and social studies.  AR 2125.  However, he still struggled with participation, writing, task completion, and math.  *Id.*

notified them that it would no longer provide him with special educational placement, services, or funding. AR 2864–65. Del Mar District explained that it was relieved of these duties because S.G.'s parents had enrolled him at NewBridge without its consent or referral, even though it had provided S.G. with a thorough and satisfactory IEP. *Id.* Along with this explanation, Del Mar District provided S.G.'s parents a copy of "Parent Rights and Procedural Safeguards," which contained a section on obtaining reimbursement for private education and filing a due process complaint if S.G.'s parents had any grievances. AR 2866–74. At NewBridge, while S.G. received specialized attention and support for his disabilities, he did not receive a formal IEP. AR 2876–931.

Subsequently, in October 2019, S.G.'s parents removed him from NewBridge so that he could receive more intensive around-the-clock educational care. Their decision was motivated in large part by S.G.'s difficulty regulating his emotions and behaviors while at home. AR 3208–12. Although S.G. was performing well at school, earning A and B grades, he was also displaying aggressive behaviors at home that resulted in multiple police visits. AR 2125, 2876–931, 3208–12. S.G.'s clinical psychologist, Sharon Lerner-Baron, identified that when his parents attempted to set boundaries and enforce discipline at home, S.G. became agitated and had explosive outbursts. AR 3208–12. In addition, she stressed that the child particularly struggled with "sudden changes" and had "difficulty knowing how to self soothe when upset." AR 3210. Moreover, she emphasized that his issue with "impulsivity, low frustration tolerance, and anxiety . . . negatively impacted his current functioning in the home environment." AR 3209. Accordingly, S.G.'s parents and therapeutic consultants believed a therapeutic boarding school, in which he could receive constant attention, would help him better manage his behavior. AR 3208–12.

After NewBridge, S.G. began attending Cherry Gulch Residential Therapeutic Boarding School, a private school in Idaho. AR 2950–54. Cherry Gulch implemented a treatment plan for his ADHD and generalized anxiety disorder that offered "holistic, trauma-informed and relational [treatment]," aiming to increase his "confidence, self-awareness, distress tolerance, flexibility and accountability" so that he could "better

navigate challenges at home." *Id.*  His treatment incorporated objectives of completing chores and household responsibilities, delaying instant gratification, learning self-soothing skills, identifying anxiety triggers, participating in family therapy, engaging in home visits, and managing boredom. *Id.*  Moreover, to treat S.G.'s addiction to technology, Cherry Gulch limited his access to electronics.  AR 5322.  Similar to NewBridge, while the student received individualized educational services and therapeutic programming, he was not formally enrolled in special education and did not have an IEP.  AR 2950–54, 2934–3018.

Although S.G. made major strides while at Cherry Gulch, he still struggled to manage his behavior and had difficulty refraining from violence.  AR 3122, 3390, 3137. After S.G. was involved in a physical altercation in November 2020, S.G.'s psychiatrist, Dr. Steinberg, diagnosed him with unspecified and intermittent explosive disorder.  AR 3654.  Furthermore, in January 2021, S.G. had a few episodes during which he became angry with staff and exhibited destructive behaviors.  AR 3390–91.  For example, he "became physical and threw rocks at staff and a vehicle" and also had an "altercation with a peer and staff" involving "swearing, inappropriate sexual comments, name calling, rock throwing, taunting and physicality to staff and peers." *Id.*  On account of these behavioral issues, Dr. Steinberg decided to reexamine S.G.'s diagnoses, ultimately determining in January 2021 that S.G. also suffered from bipolar disorder I in addition to ADHD, anxiety disorder, and unspecified and intermittent explosive disorder.  AR 3122.  Given S.G.'s violent episodes, his therapist, Ryan Hale, decided to cancel S.G.'s February 2021 home visit on the basis that he needed to further develop his regulation and coping skills before entering that environment.  AR 3390–91, 3137.

**C. S.G.'s Due Process Request & The District's IEP Offers**

While S.G. was learning how to function in the home environment at Cherry Gulch, his parents started preparing for his future educational plans in San Diego.  On May 6, 2020, S.G.'s parents began this process by requesting a due process hearing against San Dieguito District as well as Del Mar District, Poway District and North Coastal Consortium ///

7

for Special Education.[5]   AR 3399–426.   They claimed that San Dieguito District had violated its Child Find duties by not identifying him as a student who needs special education services and evaluating him earlier.   AR 2124, 3421–23.   S.G.'s parents reasoned that San Dieguito District was responsible for S.G.'s middle school education because the family lived within the District's boundaries.   AR 3020–21.   As a remedy, S.G.'s parents requested that the District reimburse them for S.G.'s prior private middle school tuition and future private school tuition as well as design an IEP for him going forward.   AR 2124, 3421–23.

San Dieguito District, however, first learned of the student and his needs through this May 2020 due process request.   AR 2123–27, 3020–21.   Although S.G. had previously qualified for special education services while attending elementary school within Del Mar District, Del Mar District had mistakenly reported S.G. as having "exited" the special education system in a database it shared with San Dieguito District.   AR 3431.   As a result, San Dieguito District was not aware of S.G.'s special education status due to Del Mar District's error.   AR 2123–27, 3020–21.

Despite this confusion, San Dieguito District responded promptly to S.G.'s May 2020 due process request by providing S.G.'s parents with information about their special education rights and a plan to assess S.G.'s educational needs going forward.   AR 3020–21.   On May 18, 2020, San Dieguito District informed S.G.'s parents in its response that the District did not have sufficient information to enroll him as a student or to review his school records.   *Id.*   Accordingly, the District provided S.G.'s parent with instructions on how to enroll S.G. and begin the special education evaluation process.   *Id.*   In addition, San Dieguito District enclosed a copy of "Parent Rights and Procedural Safeguards," a form that explained the student's rights to seek an evaluation for special education services,

---

[5] The North Coastal Consortium for Special Education is a special education government association comprised of 14 different school districts, including San Dieguito District and Del Mar District, in the north coastal area of San Diego County.   AR 169, 181.

bring a due process request when dissatisfied with an IEP offer, and seek reimbursement for private school education if denied a FAPE. *Id.* S.G. enrolled in San Dieguito District on May 21, 2020. AR 3023–28. On May 26, 2020, the District provided a plan to conduct S.G.'s triennial given that he had not been reevaluated since 2015. AR 3896–97. In this plan, it proposed to assess S.G. in the areas of academic achievement, health, intellectual development, motor development, and social emotional/behavior. *Id.* S.G.'s parents consented and signed the plan on June 1, 2020, and requested a sensory assessment as well. AR 3428–29. Following this development, the student withdrew his due process complaint. AR 3627.

On June 19, 2020, San Dieguito held an IEP meeting to discuss S.G.'s needs and a plan for moving forward. AR 3892–95. During the meeting, the student's parents commented that they believed S.G. had a mood disorder in addition to his ADHD and anxiety. AR 3893–94. They elaborated that these conditions hindered his ability to handle change and function without heavy adult structure and support. *Id.* The IEP team also contributed what they had learned about S.G. from consulting with NewBridge and Cherry Gulch. *Id.* Based on their discussions with staff at NewBridge and reviewing S.G.'s 2018/2019 report card and other documentation, the District's IEP team reported that while S.G. had some executive function, self-regulation, and written language development issues, he had generally thrived without any behavioral problems during his time there. AR 3893. Next, based on the team's preliminary conversations with staff at Cherry Gulch, including the school's Director, S.G.'s homeroom teacher, and S.G.'s primary therapist, Ryan Hale, the IEP team shared what they learned about the student's physical aggression issues, his needed medications, therapeutic services, and classroom support. AR 3894. They reported that S.G. had made meaningful behavioral and educational progress and that Cherry Gulch anticipated he would be ready to leave by October 2020. *Id.* Lastly, the IEP team commented that although they had received a few pre-COVID-19 documents from Cherry Gulch, they still had not yet received the bulk of information they needed to evaluate S.G. *Id.* The IEP team explained that up-to-date information was especially

important in this case because the student had neither received an IEP since March 2017, nor a triennial evaluation since 2015.  AR 3892–95.

Following the IEP meeting, San Dieguito District began requesting records and assistance from Cherry Gulch, but to no avail.  Starting in July 2020, the District asked Cherry Gulch to send records and for access to S.G. so that they could assess him.  AR 3054–56.  After Cherry Gulch requested clarification about the records request, the District's Director responded that the IEP team needed "any academic information (i.e. grades and level of curriculum/instruction, teacher reports, testing they may have done);" "any mental health related documentation (i.e. intake reports, treatment team plans, treatment team meeting notes, any other reports or notes regarding therapeutic interventions or programs);" and "any medical OR otherwise pertinent information regarding the student throughout the duration he has been in your program." AR 3055–56.  In response, Cherry Gulch sent S.G.'s report card, attendance report, and his April 2020 written progress report.  AR 3054–55.  However, the District was still missing critical information, including (1) his summer grades from Cherry Gulch; (2) his progress report, discipline records, treatment/counseling notes, and therapeutic intake reports from Cherry Gulch; and (3) any other records from Cherry Gulch relevant to S.G.'s behavioral and mental health needs.  AR 3059.  Moreover, S.G.'s parents still had not provided the following despite the District's requests: (1) their child's complete 2015 triennial assessment, (2) any subsequent evaluations or assessments, (3) his 2017-2018 report card, and (4) any other relevant records from NewBridge.  *Id.*

By August 2020, the District still had not been able to access S.G. for assessments or obtain the records its needed to evaluate him.  AR 3058–60.  Accordingly, it proposed a temporary placement at Torrey Pines High School with services modeled on S.G.'s 2017 IEP until it could obtain this information.  AR 3060.  The District explained again to S.G.'s parents that in order to provide him a FAPE moving forward, it would need his complete current records given that his most recent triennial was from 2015 and his last IEP was from March 2017.  AR 3059.  In addition, the District asked to be informed if S.G. would

be returning home so that it could schedule an in-person assessment. *Id.* However, S.G.'s parents never responded to the temporary placement offer nor informed the District of S.G.'s frequent trips home during the IEP process. AR 3252–53, 3257–59, 3264–65, 3268–69, 3275–76. Instead, S.G.'s parents offered to fund a trip for the IEP team to travel to Cherry Gulch to assess S.G. in person, which the District rejected because accepting such funds would violate their legal and ethical duties. AR 4413–15, 5495–56.

Given these obstacles, San Dieguito District continued its efforts to obtain information from Cherry Gulch. On September 24, 2020, the District reached out to Cherry Gulch's Academic Director, explaining that while it had a received some records and feedback, it would still need to conduct a "remote" assessments and interview of S.G., hold staff interviews, and have staff complete rating scales (a standardized tool used to diagnose students' disabilities). AR 3062–64. It elaborated that cooperation from Cherry Gulch and the following information was needed in order to evaluate the S.G.'s current academic progress and social-emotional-behavioral progress: S.G.'s mental health information and records (i.e., intake reports, mental health treatment plans, mental health progress goals, list of mental health services, and discharge plan); medical information (i.e., vision/hearing testing, any serious injuries or illnesses while at Cherry Gulch, his medications and for what conditions); behavioral information/ records (i.e., behavioral or discipline plans in place, all disciplinary information); educational information and records (i.e., school attendance records, most up-to-date grades and transcripts, educational goals and goal progress, known accommodations or supports, grade level competency information); and other records (i.e., any standardized testing that had been administered to him, date of his initial placement at Cherry Gulch, information about how Cherry Gulch is addressing his reunification with his parents and transition supports, and his anticipated release date and recommendations). *Id.* In addition, on October 9, 2020, District psychologist, Dr. Debra Lawler, reached out to the student's therapist, Ryan Hale, requesting his assistance in helping S.G. complete an interview form and three assessments that would test his student behavior, adaptive skills, attention capacities, and executive functioning. AR 3078–79.

Despite the above efforts, San Dieguito District was unable to obtain the information it needed to effectively conduct S.G.'s triennial evaluation.  On November 3, 2020, to comply with its obligations to conduct a triennial for S.G., the IEP team prepared S.G.'s formal disability and special education evaluation report, called a Multidisciplinary and Expanded Social and Emotional Evaluation ("Special Education Evaluation"). AR 3520–97 ("November 2020 Triennial").[6]   In the report, the IEP Team reviewed the little information it had: (1) S.G.'s disability and special education history from 2017 and earlier; (2) their discussions with NewBridge staff and his NewBridge records; (3) their cursory initial interviews with Cherry Gulch staff and the few Cherry Gulch documents they had; and (4) their conversation with S.G.'s parents.  *Id.*   While the IEP team thoroughly examined the minimal data they had, they ultimately concluded that without more information about S.G.'s current educational and behavioral status, they could not find that he qualified for special education.  AR 3597.  In explaining their reasoning, the IEP team noted that they could not rely on S.G.'s prior IEP records because they were from 2017 and earlier and thus, did not accurately reflect his current needs.   AR 3520–97. Furthermore, the IEP team stressed that they were unable to collect their own findings as required under the IDEA because S.G. was not made available despite their offers to assess him virtually and Cherry Gulch was not willing to assess him on their behalf.  *Id.*  As a result, the team stressed that they could not assess S.G.'s current functioning and needs because they lacked (1) test results regarding his disability areas, including his sensory integration and occupational therapy needs and (2) records from Cherry Gulch regarding S.G.'s academic and behavioral progress and his current accommodations.  *Id.*  Without this information, San Dieguito District held that it could not conclude that S.G. was disabled and required special education.  AR 3597.

---

[6] The report was originally finalized on October 30, 2020.  AR 3440.  However, the IEP team filed an amended report on November 3, 2020.  AR 3520.  Accordingly, the Court references the updated report and November 3, 2020 date.

On November 3, 2020, San Dieguito District held an IEP meeting to reviews its November 2020 Triennial Special Education Evaluation with S.G.'s parents. AR 3601–04. Throughout the meeting, the IEP team reiterated that its evaluation was compromised by Cherry Gulch's and the parents' unwillingness to cooperate despite its explicit requests for documentation and repeated efforts to virtually assess S.G. AR 3603–04. Moreover, the team stressed that the recent records they did have indicated that the student did not necessarily require special education. *Id.* In support of this assertion, the IEP team explained that S.G.'s NewBridge records suggested that his needs could be met by a modified general education program given his academic success and behavioral progress. *Id.* However, the student's parents were dissatisfied with the District's response, insisting that Cherry Gulch's capacities were limited due to a major COVID-19 outbreak and that his records from 2017 and earlier clearly established his disabilities and qualifications for special education. *Id.*

As a result, on November 23, 2020, S.G.'s parents filed a second request for a due process hearing, reinitiating the entire process. AR 3607–43. In January 2021, the District offered to evaluate S.G. once again, providing an assessment plan, which his parents later signed on February 2, 2021. AR 3649–50. This time, S.G. participated in the process, engaging in testing and assessments throughout February and March of 2021. AR 3652–3862. On March 31, 2021, the IEP team produced another Special Education Evaluation for S.G., in which they concluded that he qualified for special education under the primary category of Other Health Impairment as he had ADHD, anxiety disorder, intermittent explosive disorder, and bipolar I disorder and qualified for special education services under the secondary category of Emotional Disturbance. AR 3859–61.

In coming to this conclusion, the IEP team recognized that S.G. struggled with emotional dysregulation and explosive behavior and noted that these issues often arose when he was at home. AR 3652–3862. In S.G.'s March 31 Special Education Evaluation, the IEP team specifically noted the student's history of being "easily angered at home" and susceptibility to becoming "verbally and physically aggressive very quickly in the home."

22-CV-00450

AR 3681.  Moreover, the evaluation identified that S.G. had a "limited distress tolerance" that "led to significant struggles accepting parental authority."  *Id.*   In addition, the report stated that the student's projected graduation date from Cherry Gulch had been pushed out to June 2021 on account of various violent outbursts earlier that year.  AR 3656.  Likewise, the report included notes from S.G.'s psychiatrist at Cherry Gulch, Dr. Steinberg, which reflected that S.G. often lacked control of his emotions, threw fits at home when his needs were not immediately satisfied, and blew up when "circumstances change[d]."  AR 3742–43.   In summing up the student's issues, the IEP team ultimately concluded that he struggled with emotional regulation due to anxiety and limited frustration tolerance, which in turn led to maladaptive responses including elevated anger, aggressive outbursts, and depression symptoms.  AR 3163.

On April 2, 2021, San Dieguito District provided S.G. with a formal written IEP and held an IEP meeting to discuss its proposed placement and programming.  AR 3179–81. In its written IEP, the District offered S.G. immediate placement at New Haven, a private school in San Diego that provided a small and structured therapeutic setting with integrated mental health and behavioral services.  *Id.*  In addition to general education services at New Haven, the IEP indicated that S.G. would have specialized group academic instruction, individual counseling, group counseling and guidance, and parent counseling.  AR 3180–81.   The written offer also stated that S.G. would have community-based services ("Wraparound Services") for 120 minutes weekly over the course of the first three months. AR 3181.

Although the student's parents expressed satisfaction with the thoroughness of the District's offer during the IEP meeting, they also raised concerns about bringing S.G. home before he was ready.  AR 3183–85.  S.G.'s parents stressed that S.G. was not prepared to be in the family home and that he needed a transition program before returning to San Diego.  *Id.*  In response, the IEP team explained that the New Haven placement included Wraparound Services to help the student make the transition home and also that Newhaven had an optional residential program that could be explored further if needed.  *Id.*  However,

S.G.'s parents responded that S.G. needed to remain at Cherry Gulch until his anticipated completion date of June 14, 2021. *Id.* In light of the parents' concerns, the IEP team stated that it may be possible to do some "overlapping therapeutic collaborations" with the Cherry Gulch staff if S.G. was not ready to return home quite yet. AR 3185. S.G.'s parents added that after Cherry Gulch, they would like S.G. to attend Novitas Therapeutic Boarding School ("Novitas"), a private residential high school for boys in Idaho that was affiliated with Cherry Gulch, as a step-down program. AR 3184. They reasoned that his attendance at Novitas was essential for his transition as it was less restrictive than Cherry Gulch, but still offered a residential component to help him prepare to return home. AR 3184–85. Because the student's parents believed these placements were critical for S.G.'s success, they also requested that the District fund S.G.'s education and cover related expenses at these private institutions. *Id.* However, the IEP team maintained that New Haven would sufficiently meet S.G.'s needs given the Wraparound Services and therapeutic programming. *Id.* As a result, S.G.'s parents filed a due process request against San Dieguito District on April 28, 2021, AR 2–50, which they later amended on May 31, 2021, AR 371–430, and again on June 18, 2021, AR 779–850, alleging that the District's IEP was inadequate and requesting reimbursement for S.G.'s private schooling.

**D. S.G.'s Subsequent Education**

Instead of accepting the District's offer, S.G. proceeded with his parents' educational plans. As his parents insisted, S.G. continued his education at Cherry Gulch until his graduation on June 14, 2021. AR 3975–76. Subsequently, S.G. attended Novitas for the rest of the summer. *Id.* After transitioning back home, S.G. returned to live with his parents in August 2021. *Id.* Instead of accepting the District's IEP offer at New Haven, which would have provided a small, therapeutic educational setting with integrated mental health and behavioral services at a private school, S.G. began school at High Tech High, a public charter school outside San Dieguito District, in August 2021. *Id.* Because San Dieguito District's IEP could not be transferred to High Tech High, the charter school had to evaluate and assess the student's eligibility for special education independently. AR 4447. While

it completed this process, S.G. was found to be eligible for special education in the interim and received support for executive functioning deficits and anxiety management. AR 5549–51.

**E. The ALJ's Hearing**

In his June 18, 2021 due process request, S.G. alleged that San Dieguito District had denied him a FAPE on multiple grounds. AR 3971–4029 ("ALJ Order"). Among other issues, S.G. asserted that the District violated the IDEA by (1) failing to identify him as a student with disabilities while he was in private school in violation of its Child Find obligations; (2) failing to provide him with mandatory information about his rights to seek reimbursement while he was enrolled in private school; (3) failing to assess his sensory integration and assistive technology needs in its November 2020 Triennial when it should have known these were disability concerns for him; (4) failing to provide alternative methods of conducting assessments for his November 2020 Triennial due to the difficulties posed by the COVID-19 pandemic; (5) finding him ineligible for special education in his November 2020 Triennial when he clearly qualified for such services given his well-documented disability and special education history; and (6) failing to offer an appropriate placement in his April 2, 2021 IEP because New Heaven did not offer the behavioral and transitional support services that S.G. needed.[7] ALJ Order at 3–4.

As a result, in November 2021, the ALJ held a seven-day hearing, hearing testimony from a total of twelve witnesses. ALJ Order at 1–2. During the hearing, the ALJ heard pertinent testimony about (1) the District's Child Find policy from the District's Director of School and Student Services, Tiffany Hazlewood; (2) the District's difficulty obtaining necessary documents and accessing S.G. in conducting its November 2020 Triennial from Tiffany Hazlewood and District psychologists, Heather Lutz and Dr. Lawler; (3) testimony about what resources are needed to evaluate a student's qualifications for special education

---

[7] While S.G. raised other grievances before the ALJ hearing, the Court only lists the issues that he appeals before this Court. *See* Pl.'s Mot. Summ. J.

from expert Dr. Griffiths; (4) testimony about S.G.'s behavioral issues and ability to cope with change from S.G.'s father, J.G., and S.G.'s primary therapist at Cherry Gulch, Ryan Hale; and (5) testimony about the effects of bipolar disorder from S.G.'s psychiatrist at Cherry Gulch, Dr. Steinberg, and expert Dr. Griffiths.  AR 4032–5737.

Principally, Tiffany Hazlewood testified about the District's Child Find policy, describing its system for identifying, locating, and evaluating students with disabilities within the District as required under the IDEA.  AR 5670–79.  She explained that the District had a "private school case manager," who was responsible for contacting private schools and inquiring whether they suspected that any of their students may have disabilities.  *Id.*  Ultimately, the ALJ found Hazlewood credible.  ALJ Order at 10.

Second, Lutz, Dr. Lawler, and Hazlewood all testified about the District's inability to access requisite information for S.G.'s November 2020 Triennial.  They all attested that Cherry Gulch and S.G.'s parents were either unresponsive or noncompliant during the evaluation process. AR 5218–25, 5307–11, 5626–31.  They explicitly stated that they only made virtual requests of Cherry Gulch and S.G. by offering to do interviews and assessments over Zoom and by requesting documents via email.  AR 5228–31, 5367–70, 5615–18.  Of note, Dr. Lawler also testified that she was not aware that S.G. required any assistive technology given that he had limited access to electronics while at Cherry Gulch.  AR 5321–22.  Although S.G.'s father, J.G., disputed these accusations, insisting that he and S.G.'s mother were cooperative and helpful throughout the entire evaluation process, AR 5488–96, the ALJ ultimately found the IEP team's testimony more credible given their "consistent" testimony about their "direct involvement in the assessment process" and "personal contacts with Cherry Gulch."  ALJ Order at 23.

Third, Dr. Griffiths testified about what a school district needs in order to determine a student's eligibility for special education.  AR 4853–55.  He stated that in certain circumstances a "file review" could provide sufficient information in determining a student's eligibility for special education.  *Id.*  However, he qualified this statement by conceding that this would only be feasible if there is a "plethora of background

information" and "current information available" as well the inclusion of "interviews with present staff that know him." AR 4854. Moreover, he stated that this process would entail looking at "progress reports," conducting "interviews with teachers," and having "discussions with the psychiatrist [and] psychologist." AR 4854–55. Dr. Griffiths stated that with access to such resources—including S.G.'s then current diagnosis of bipolar disorder, treatment team notes, and information from the school and his psychiatrist—he believed that he would have been able to diagnose S.G. as qualifying for special education. AR 4856–58.

Fourth, J.G., the student's father, and Ryan Hale, his primary therapist at Cherry Gulch, spoke to S.G.'s difficulty regulating his emotions while at home and his uptick in aggressive behavior prior to his April 2021 IEP. AR 4400–03, 5136–43. Specifically, Hale noted that he decided to extend S.G.'s release date to June 2021 due to a rise in S.G.'s aggressiveness with peers and staff, explaining that an early discharge raised safety concerns. AR 5137. Moreover, J.G. elaborated on his disappointment with the District's recommended placement in its April 2, 2021 IEP given S.G.'s difficulty with transitions. AR 4403. He explained that the offer was insufficient because it required S.G. to immediately attend New Haven, reasoning that even though S.G. was making meaningful progress, he still had significant behavioral problems and thus would regress if he was pulled out of Cherry Gulch before he was ready. AR 4437–38. Finally, J.G. stated that the District did not provide any specification during the IEP meeting of what "Wraparound Services" constituted. AR 4432–33.

Lastly, Dr. Steinberg and Dr. Griffiths spoke to the impact of S.G.'s bipolar disorder diagnosis on his ability to transition. AR 4693, 4841–46. Principally, Dr. Steinberg clarified that S.G. went through cycles, in which he initially behaved well for an extended period of time, but ultimately regressed and became extremely violent. AR 4677–79. He asserted that these aggressive episodes prompted him to shift his diagnostic framework, leading to S.G.'s diagnosis of bipolar disorder I in January 2021. AR 4677–79, 4681. Dr. Steinberg stated that as a result S.G. required wraparound services where people could

contain him and observe him to help him safely manage his aggression. AR 4693. Second, Dr. Griffiths opined that as a child with bipolar disorder, S.G. was likely to have certain "triggers" including changes in "routine and consistency," which often led individuals with bipolar disorder to feel "overwhelmed and overstimulated." AR 4844. He highlighted that the transition from a therapeutic boarding school, in which he received 24-hour care, to living at home and commuting to school would present new challenges, such as the stresses around transportation and issues around sleep. AR 4843–46. In addition, he opined that if S.G. had been immediately pulled out of Cherry Gulch without transition services, his progress would have likely been undermined. *Id.*

**F. ALJ Decision**

On January 3, 2020, the ALJ concluded that San Dieguito District's handling of S.G.'s needs complied with the IDEA in all regards but one—appropriate placement for the limited time period between April 2, 2021 and June 11, 2021. ALJ Order. Regarding the issues appealed to this Court, the ALJ found that the District did not deny S.G. a FAPE for the following reasons: (1) the District did not violate its Child Find duties under the IDEA because (a) it had a legally compliant plan in place to identify children with disabilities and (b) it had no obligation to identify S.G. as he was attending a private school outside of its domain; (2) the District did not fail to provide S.G. with mandatory information about his rights to seek reimbursement because it provided him with a pamphlet explaining these rights shortly after S.G.'s parents filed their May 2020 due process request; (3) the District was not obliged to evaluate whether S.G. needed assistive technology or had sensory integration issues for purposes of his November 2020 Triennial because the District was effectively prevented from evaluating S.G. due to its inability to access him or his recent records; (4) the District provided proper assessment modifications for S.G.'s November 2020 Triennial during the COVID-19 pandemic by offering to conduct assessments virtually; and (5) the District did not err in finding S.G. ineligible for special education in his November 2020 Triennial given that it could not effectively evaluate S.G. due to Cherry Gulch's failure to provide up-to-date records and S.G.'s failure

to make himself available for assessment. *Id.* Finally, while the ALJ concluded that the District's April 2, 2021 placement offer at New Haven adequately met S.G.'s future needs, she found that this plan did not adequately account for his transitional needs in departing from Cherry Gulch and adjusting to life at home. *Id.* at 36–45. She thus concluded that the District's offered placement failed to provide S.G. a free appropriate public education from April 2, 2021 to June 11, 2021. *Id.* at 41–43. The ALJ also found that Cherry Gulch was an appropriate placement to provide those transitional needs for S.G. during that time and ordered San Dieguito District to reimburse S.G. for the two months of tuition and related costs. *Id.* at 36–45.

## G. Subsequent Procedural History

On April 5, 2022, S.G. filed suit against San Dieguito District, North Coast Consortium for Special Education, California Department of Education, and San Diego County Department of Education. Dkt. 1. After multiple rounds of motions to dismiss by various Defendants and Plaintiff's voluntary dismissal of Defendant California Department of Education, San Dieguito District is the only Defendant that remains in this action. Dkt. 71. In his third amended complaint, S.G. appealed the six issues identified above and alleged that San Dieguito violated Section 504 of the Rehabilitation Act. Dkt. 58. On September 9, 2023, San Dieguito filed a counterclaim against S.G. appealing the ALJ's finding that S.G. was entitled to reimbursement of his Cherry Gulch tuition between April 2, 2021 and June 11, 2021 because the District failed to account for S.G.'s transitional needs. Dkt. 61.

On December 22, 2023, Defendant filed a motion for summary judgment, appealing the above ALJ decision. Def.'s Mot. Summ. J. #1. On January 12, 2024, S.G. moved for summary judgment on all of his claims, both appealing the ALJ's determination that the District did not deny S.G. a FAPE on the six grounds identified above and also requesting summary judgment on his Rehabilitation Act claims. Pl.'s Mot. Summ. J. On June 17, 2024, the District filed a second motion for summary judgment with regard to S.G.'s Rehabilitation Act claims. Def.'s Mot. Summ. J. #2.

## II.    LEGAL STANDARD

### A. Appeal of the California Office of Administrative Hearing Decision

"Judicial review under the IDEA is an odd creature in administrative law." *Los Angeles Unified Sch. Dist. v. A.O. by & through Owens*, 92 F.4th 1159, 1168 (9th Cir. 2024). The IDEA instructs a reviewing court to (1) receive and review the record of the administrative proceeding; (2) if requested by either party, hear additional evidence; and (3) grant appropriate relief based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(c). Under the IDEA, federal courts accord considerably less deference to state administrative proceedings than they do in most agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review. *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Off. of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011) (internal quotation marks omitted). The statute empowers the reviewing court to hear evidence that goes beyond the scope of the administrative record and, based on a preponderance of the evidence, "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

"Complete de novo review, however, is inappropriate." *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). Courts must give "'due weight' to judgments of education policy" when reviewing state administrative decisions. *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)). This is because federal judges are not experts in educating children with disabilities and, the IDEA does not empower district courts to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (internal citation omitted). Accordingly, administrative findings that are "thorough and careful" are entitled to "particular deference." *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008); *see Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993) (establishing that an ALJ's decision is entitled to "substantial weight" when it "evinces his careful, impartial consideration of all the evidence and demonstrates his

sensitivity to the complexity of the issues presented"). Moreover, although a district court may consider "additional evidence[,]" it should only do so at the "request of a party." *Ojai*, 4 F.3d at 1471. Lastly, in an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

The parties' motions are, in part, cross-appeals of an administrative decision. As neither party has requested that the Court consider "additional evidence"[8] by filing additional exhibits or requesting an evidentiary hearing about a factual dispute, it will base its decision exclusively on the administrative record.[9] 20 U.S.C. § 1415(i)(2)(c). After reviewing the ALJ's decision, the Court finds that the ALJ's thoughtful analysis is worthy of "due weight." *Gregory K.*, 811 F.2d at 1311 (internal citation omitted). The ALJ held a seven-day hearing, soliciting testimony from and actively questioning twelve witnesses. ALJ Order; AR 4032–5737. Based on this careful examination, the ALJ wrote a 59-page written decision that reviewed the factual background, assessed the evidence and testimony presented at the hearing, and thoroughly analyzed each issue and sub-issue. *See generally* ALJ Order*; see A.O.*, 92 F.4th at 1168 (finding decision worthy of deference where ALJ held a six-day hearing and issued a 28-page decision); *see also R.B. ex rel. F.B. v. Napa*

---

[8] The Ninth Circuit has held that "additional evidence" constitutes "supplemental" evidence. *Ojai*, 4 F.3d at 1472–73. A district court should not permit evidence that either "repeat[s]" or "embellishes" prior testimony as this may "change the character of the hearing from one of review to a trial *de novo*." *Id.* at 1473. Thus, an "administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial." *Id.* A court should "weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources." *Id.* Rather, additional evidence should be admitted due to issues such as "gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Id.*

[9] This applies to all the issues raised except the District's request that the Court reduce or deny reimbursement based on equitable factors. *See infra*, Section III.B.6. As the Court has decided to hold an evidentiary hearing on this issue, for the reasons discussed below, the Court will consider "additional evidence" beyond the administrative record in making this future determination. *Ojai*, 4 F.3d at 1473.

*Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) ("We treat a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" (internal citation omitted)). Thus, the Court finds that the ALJ's analysis was exhaustive and well-reasoned, warranting deference here. See *JG*, 552 F.3d at 793. Accordingly, with this deference in mind, the Court will assess whether the preponderance of the evidence from the administrative record supports the ALJ's factual findings and legal conclusions.

**B. Summary Judgment**

Because the parties also move for summary judgment on S.G.'s Section 504 of the Rehabilitation Act claims in addition to appealing the ALJ's administrative decision, the Court must also apply summary judgment standards to the second portion of the parties' cross-motions.

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial. *Id.* at 322–23. The moving party may also satisfy its initial burden by demonstrating that the opposing party lacks

sufficient evidence from which a jury could find an essential element of the opposing party's claim. *Id.* at 325; *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d. 1099, 1102 (9th Cir. 2000).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 324. The nonmoving party cannot merely rest on his pleadings, but must direct the court to specific, triable facts by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see Anderson*, 477 U.S. at 250. The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

### A. S.G.'s Objection to the ALJ's Handling of his "Notice of Errata"

Before turning to the substance of the parties' cross-appeals and S.G.'s Section 504 claims, the Court must first examine S.G.'s objection to the ALJ's exclusion of his Notice of Errata. Pl.'s Mot. Summ. J. at 11–13. During the administrative proceedings, S.G.'s counsel mistakenly filed an early draft of his supplemental brief rather than the final version. ALJ Order at 2. In an attempt to fix this error, counsel filed a six-page addendum providing additional briefing and titled it a "Notice of Errata." However, because it was submitted after the deadline, the ALJ did not consider the additional briefing in rendering her decision. *Id.* S.G. now challenges the ALJ's exclusion of this addendum.

Notices of Errata are used to correct "clerical errors," not to present new or substantially different evidence or arguments to the court. *See Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007). Accordingly, a party may not use this as a vehicle to file unauthorized supplemental briefing. *Id.* In making these determinations, however, a

federal court must keep in mind the importance of resolving claims on the merits. *PePe's, Inc. v. City of Rancho Cucamonga*, No. EDCV202506JGBSPX, 2023 WL 6866375, at *2 n.1 (C.D. Cal. Sept. 5, 2023) (citing *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984)).

Here, as S.G. filed an entire additional six pages of briefing, rather than a correction to a typographical or citation error, his filing does not qualify as a Notice of Errata. ALJ Order at 2. While S.G.'s counsel asserts she made a "clerical error" in accidentally uploading the wrong document, a Notice of Errata is limited to amending errors that are *in substance* clerical, not which occurred *on account* of clerical failures. Pl.'s Mot. Summ. J. at 12; *cf. PePe's*, 2023 WL 6866375, at *2 n.1 (overruling defendant's objections to plaintiff's Notice of Errata because the notice sought to correct clericals error by adding citations to the record and missing excerpts of the record).[10]

Therefore, the Court concludes that the ALJ reasonably excluded S.G.'s "Notice of Errata" given that S.G.'s counsel was attempting to file additional substantive briefing past the ALJ's imposed deadline. Accordingly, S.G.'s objection is OVERRULED.

**B. Appeal and Cross-Appeal of the ALJ's Decision**

The Court will now assess the parties' cross-appeals of the California Office of Administrative Hearing decision. S.G. contends that the ALJ failed to recognize the District's procedural and substantive violations of the IDEA. First, S.G. asserts that San Dieguito violated the IDEA's procedural requirements by failing (1) to identify him as a student with disabilities while he was attending private school, thereby violating their Child Find obligations; (2) to provide him with mandatory information about his rights to seek reimbursement while he was attending private school; (3) to assess him in certain suspected areas of disability like sensory integration and assistive technology needs during his November 2020 Triennial; and (4) to provide alternate methods to conduct assessments

---

[10] As this filing is already part of the administrative record, S.G. could have argued that the ALJ's decisions substantively failed on account of her failure to incorporate this additional briefing and requested that the Court review this addendum in rendering its decision. However, S.G. does not make such an argument.

and evaluations in light of the difficulties posed by the COVID-19 pandemic. *See generally* Pl.'s Mot. Summ. J. In addition, S.G. argues that the District substantively violated the IDEA by finding him ineligible for an IEP in his November 2020 Triennial, despite his failure to make himself available for an assessment or provide requested material. *Id.* The District, on the other hand, contests the ALJ's conclusion that the District did deny S.G. a FAPE between April 2, 2021 to June 11, 2021 by failing to offer an adequate transition plan for S.G. Def.'s Mot. Summ. J. #1. The Court addresses these issues in turn below.

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In exchange for federal funds, state and local education agencies agree to provide a FAPE to all children with disabilities residing in the state from ages 3 to 21. *A.O.*, 92 F.4th at 1165 (citing 20 U.S.C. § 1412(a)(1)(A)). A child receives a FAPE, for purposes of the IDEA, if the program addresses the child's unique needs, provides adequate support services so that the child can take advantage of educational opportunities, and is in accord with the IEP. *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1003 (9th Cir. 2017). Accordingly, a school denies a student a free appropriate public education when it wrongfully finds a child unqualified for special education or where the services offered in the child's IEP fail to adequately account for his or her special needs. *Id.* at 1003–04.

In order to ensure that every child with disabilities receives a FAPE, the IDEA requires that school districts follow certain procedures. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009). The IDEA demands that school districts take specific steps in determining students' eligibility and servicing their needs in providing special education. These procedural duties, include but are not limited to, (1) identifying children with disabilities, (2) providing notice and mandated information to parents, (3) conducting evaluations in certain circumstances, (4) assessing "suspected" areas of disability, (5) holding IEP meetings, and (6) involving parents in the IEP process. 34

C.F.R. §§ 300.111, 300.304, 300.320, 300.322, 300.504.  In addition, the IDEA and its accompanying regulations not only explicitly instruct school districts on what steps must be taken in fulfilling these obligations, but also provide standards that these agencies must meet when designing and implementing their own special education systems and protocols. *Compare* 34 C.F.R. §§ 300.111(a) *with* 300.504(a).

To begin its analysis, a court must first assess "whether the IDEA's procedures were complied with and second whether the district met its substantive obligation to provide a FAPE." *A.O.*, 92 F.4th at 1169 (internal citation omitted).  "Procedural violations of the IDEA can be harmless, but not if they 'substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits.'" *Id.*  (internal citation omitted). Importantly, "[n]ot all procedural violations amount to a denial of FAPE." *L.J.*, 850 F.3d at 1003.  A school district violates the IDEA's substantive requirements when it fails to offer an individualized education program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *A.O.*, 92 F.4th at 1165.

Therefore, the Court will first address S.G.'s appeal, in which he challenges five of the ALJ's decisions relating to procedural violations of the IDEA.  Next, the Court will turn to the substantive components of S.G.'s appeal, in which he argues that the District denied him a FAPE in finding him ineligible for special education in his November 2020 triennial assessment.  Following the Court's conclusion of S.G.'s appeal, the Court will pivot to San Dieguito's cross-appeal, in which it asserts that the District did not substantively violate the IDEA in failing to account for S.G.'s transitional needs in its April 2, 2021 IEP.  In rendering these decisions, the Court will evaluate whether the moving party has met its burden to establish that the preponderance of the evidence supports their claims while affording the ALJ's decision "due weight." *See* 20 U.S.C. § 1415(i)(2)(c); *L.M.*, 556 F.3d at 910; *Gregory K.*, 811 F.2d at 1311 (internal citation omitted).

### 1.  Procedural Violation: Child Find

Because S.G.'s parents live within the District, S.G. asserts that San Dieguito

District violated its Child Find duties in failing to find and evaluate him while he was enrolled in private schools outside of the District.  Pl.'s Mot. Summ. J. at 13–14. Accordingly, the Court must determine whether he has established this contention by a preponderance of the evidence or whether the ALJ correctly found that the District had an adequate policy that relieved it of any duty to "find" S.G. given that he was enrolled in private schools outside of the District.

Federal and state law requires school districts to "locate, identify and assess" children for special needs, irrespective of whether they are currently within their public school system or attend private schools within their service area.  20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111; Cal. Educ. Code § 56171.  Under California law, once the school district locates these children, it must then undertake the following steps to provide them with a free appropriate public education: notify parents of their procedural safeguards under the IDEA, conducts assessments, and evaluate their qualifications for special education. Cal. Educ. Code § 56301(d).  In other words, even if a student is enrolled in a private school, school districts are required to identify children located within their geographical region.  20 U.S.C. § 1412(a)(10)(A)(ii); 34 C.F.R. § 300.131.  However, a school district is under no obligation to search for students who attend private schools outside of its borders even if those students' parents reside within the school district's jurisdiction. 34 C.F.R. § 300.131.  For example, if a child is placed in an out-of-state private school, it is the responsibility of the school district where the private school is located—not the school district where the parents reside—to locate and evaluate the child under the IDEA.  *See id.*

After reviewing the ALJ's opinion, the Court concludes that the ALJ properly found that the District had an established, legally compliant Child Find policy and that it had no obligation to search for children with disabilities enrolled in private schools beyond its borders.  ALJ Order at 6–13.  First, contrary to S.G.'s arguments otherwise, the ALJ did examine and specifically find that the District had a procedure in place to find children with disabilities in private schools.  ALJ Order at 9–10.  In coming to this conclusion, the

ALJ considered the District's Director, Tiffany Hazlewood's, credible testimony that the District has a "private school case manager." *Id.*; *see* AR 5670–79. Based on her testimony that the private school case manager was responsible for reaching out to all of the private schools within its borders, inquiring whether those schools suspect that any of their students have disabilities, and then contacting those children's parents, the ALJ reasonably found that the District had an operational practice for identifying and locating children with disabilities. AR 5670–79. Moreover, the ALJ also weighed the fact that the District had a written policy detailing its evaluation process *following* the identification stage. ALJ Order at 9–10; AR 3864–3871. Given the District's concrete procedures for identifying children who may have disabilities and evaluating them thereafter, the ALJ had a sufficient basis to find that the District had a clear and established Child Find policy with respect to children enrolled in private schools. ALJ Order at 9–10.

The ALJ also reasonably found that the District was legally justified in limiting its Child Find duties to children enrolled in public and private schools within its borders. ALJ Order at 7–9. First, the ALJ properly found that the District's Child Find policy met its legal obligations because the policy had a method of identifying students with disabilities attending private schools within its geographic territory. *Id.*; *see* 20 U.S.C. § 1412(a)(10)(A)(ii); 34 C.F.R. § 300.131. In reaching this conclusion, the ALJ even examined the legislative purpose behind limiting a school district's responsibilities to private school students within its physical boundaries. ALJ Order at 8. The ALJ reasoned that if the legislature did not restrict school districts' Child Find duties in this way, they would be required to search for students all around the country, which would only be "chaotic, wasteful, and duplicative." *Id.* Thus, after careful consideration, the ALJ correctly found that San Dieguito District's policy of identifying children that attend private schools within its domain was adequate. *Id.* at 7–9.

Finally, the ALJ properly determined that the District did not have a Child Find duty as to S.G. until his parents filed their due process request in May 2020. *Id.* at 9. Because S.G.'s parents had unilaterally placed him in private schools outside of Del Mar District's

and San Dieguito District's boundaries, neither of these school districts had any obligation to "identify" and "evaluate" S.G. as a student with disabilities.  AR 2864–65; 34 C.F.R. § 300.131.  Rather, by law, the school districts covering NewBridge and Cherry Gulch would have assumed any existing Child Find duties for S.G.  34 C.F.R. § 300.131.

Therefore, the Court finds that the ALJ properly concluded that San Dieguito District did not violate its Child Find duties because it had an established, legally compliant process for identifying students enrolled in private schools within its boundaries in addition to having no obligation to find students, like S.G., who were enrolled in private schools outside its territory.

## 2. Procedural Issue: Notice of Parental Rights

Because S.G.'s parents live within San Dieguito District, S.G. contends that the District was obligated to provide his parents with a copy of their "procedural safeguards" under the IDEA.  Pl.'s Mot. Summ. J. at 15–18.  Accordingly, he asserts that the District violated this duty in failing to notify them of these rights, including the right to seek reimbursement for private school tuition, before his parents filed a due process request in May 2020.  *Id.*  Thus, the Court must determine whether S.G. has met his burden of proof or whether the ALJ correctly found that it had no duty beforehand and that it adequately met this obligation in its May 2020 response.

Under the IDEA, the school district with the special education responsibility for a child is required to provide the parents with a written overview of their "procedural safeguards."  20 U.S.C. § 1415(d).  Under California law, the school district that holds a Child Find duty—which for purposes of private school, is the school district where the private school is located, 34 C.F.R. § 300.131—is required to notify parents of these rights once a school year.  Cal. Educ. Code § 56301(d) (codifying under California law that notice of procedural safeguards, 20 U.S.C. § 1415(d)(1)(A) & 34 C.F.R. § 300.504(a), falls under Child Find duties).  Theses procedural safeguards include, but are not limited to the following: parents' rights to (1) seek an independent special education evaluation; (2) review their child's educational records; (3) file a due process complaint; (4) participate in

30

IEP meetings; and (5) seek reimbursement for private school tuition in certain circumstances.  20 U.S.C. § 1415(d)(2).

Here, the ALJ correctly concluded that San Dieguito District was not obligated to provide S.G. with a copy of his "procedural safeguards" prior to the filing of his due process complaint against the District in May 2020.  ALJ Order at 13–14.  S.G. appears to argue that because his parents' residence was within San Dieguito District's boundaries, the District was required to provide his parents with a copy of these rights after he completed elementary school.  Pl.'s Mot. Summ. J. at 15–18; *see* AR 3020–21.  However, as the ALJ found, once S.G.'s parents decided to unilaterally place him in a private school outside Del Mar District in 2017, neither Del Mar District, for elementary school, nor San Dieguito District, for middle and high school, were responsible for his special education under the IDEA.  ALJ Order at 9, 13–14; 34 C.F.R. § 300.148 (establishing that if a parent unilaterally places their child in private school without the consent or referral of the school district, the school district is not required to provide special education if it has made a FAPE available).  At that point, because S.G. was enrolled in private schools, first at NewBridge and subsequently at Cherry Gulch, the school districts in which these schools were located held the duty to identify him and inform him of his procedural safeguards.  34 C.F.R. § 300.131.  While Del Mar District did err in exiting S.G. from its shared database with San Dieguito District as S.G. argues, this mistake was inconsequential.  *See* AR 3431.  Even if the student had remained in the database as a student who had received an IEP but unilaterally withdrew, the District still would not have had any duties as to S.G.  34 C.F.R. § 300.131; Cal. Educ. Code § 56301(d).  Accordingly, the Court finds that the record supports the ALJ's conclusion that San Dieguito District was not obliged to give S.G.'s parents a copy of their procedural safeguards before May 2020.  ALJ Order at 13–14.

Moreover, the record suggests that S.G. did in fact receive information about how to seek reimbursement for private school tuition when he left Del Mar District.  AR 2864–74.  In 2017, when S.G. withdrew from the public school system, Del Mar District not only advised his parents that it would no longer be responsible for his special education, but it

also provided them with a copy of "Parent Rights and Procedural Safeguards," which explained how to seek reimbursement for private education. *Id.*

Second, the ALJ reasonably found that the District met its obligation to provide procedural safeguard information to S.G. following his May 2020 due process request. ALJ Order at 13–14. The record clearly establishes that the District promptly responded to S.G.'s due process request on May 18, 2020 by providing instructions on how to begin the evaluation process and a copy of S.G.'s procedural rights, detailing his rights to an evaluation, the IEP process, interim placements, due process hearings, and reimbursement for private schools. AR 3020–21. Accordingly, the Court finds that the ALJ properly concluded that San Dieguito District met its obligations to provide S.G. with mandated information as soon as it was obliged to do so.[11] ALJ Order at 13–14.

In conclusion, the Court upholds the ALJ's determination that San Dieguito District met its duty to provide S.G.'s parents with a copy of their procedural safeguards given that the District was not required to send these any time prior to S.G.'s May 2020 due process request.

### 3. Procedural Issue: Sensory Integration and Assistive Technology Assessment

S.G. argues that San Dieguito District failed to assess him in the areas of sensory integration and assistive technology when it had reason to suspect he may need support for these issues in his November 2020 Triennial. Pl.'s Mot. Summ. J. at 18–20. Accordingly, the Court must examine whether the District violated its duty to assess S.G. in these suspected disability areas or whether the ALJ properly found that the District did not err given that it was prevented from meaningfully assessing the child's current capabilities.

Under the IDEA, a school district is required to assess a child in all areas related to

---

[11] S.G. also argues that the ALJ legally erred because she failed to recognize that S.G. was automatically eligible for special education. However, even if S.G. had not been exited from Del Mar District's and San Dieguito District's shared database, the school district would not have been obligated to reevaluate him. 20 U.S.C. § 1414(a)(2)(b)(ii) (establishing that students must be evaluated at least once every three years to determine their eligibility). Moreover, this does not change the fact that San Dieguito did not have any obligation to S.G. until May 2020.

a suspected disability.   20 U.S.C. § 1414(b)(3)(B); Cal. Educ. Code § 56320(f).   A disability is "suspected," and an evaluation is required, when the district is on notice that the child has exhibited symptoms indicative of that particular disability or disorder. *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119–20 (9th Cir. 2016). Notice may come in the form of parents raising concerns about their child's symptoms, informed professionals identifying issues, or less formal indicators, like the child's behavior. *Id.* at 1121.

When conducting assessments, a school district must "use technically sound instruments" to examine the child's "relative contribution of cognitive and behavioral factors." 20 U.S.C. § 1414(b)(2).   In addition, an IEP team must be able to observe the child in the classroom and speak with teachers and related service providers in addition to reviewing existing evaluation data. *Id.* § 1414(c)(1)(A).   Furthermore, the IEP team needs to assess the child's "*present* levels of academic achievement and related developmental needs." *Id.* § 1414(c)(1)(B)(ii) (emphasis added).

Here, the preponderance of the evidence supports the ALJ's conclusion that the District did not deny the student his rights to a free appropriate public education by failing to assess his sensory integration and need for assistive technology.   ALJ Order at 16–20. Principally, the record clearly establishes that while the District intended to assess S.G. in many disability areas, it was unable to do so.   AR 3896–97.   The Court agrees with the ALJ that the District could not meaningfully assess the child's current needs because (1) it was unable to interact with and observe S.G.; (2) Cherry Gulch staff did not share information about S.G.'s needs in these areas and would not assess S.G. on behalf of the District; and (3) the District lacked access to relevant and recent documentation about S.G.'s need for assistive technology or issues with sensory integration.   AR 3054–60, 3062–64, 3078–79, 3520–97 3896–97.   Foremost, without access to S.G., the District could not meet its obligation to observe him in the classroom setting. 20 U.S.C. § 1414(c)(1)(A). Given that neither S.G.'s parents nor Cherry Gulch were willing to produce S.G., the District requested Cherry Gulch staff's support.   AR 3054–56, 3058–60, 3062–64, 3078–

79.  However, while the IEP team asked S.G.'s teachers and therapists to provide feedback and conduct tests on its behalf, they were unresponsive.  AR 3054–56, 3058–60, 3062–64, 3078–79, AR 3603–04.  Accordingly, the District had no means to meet its obligation to "speak with teachers and related service providers[,]" nor adequately test S.G.'s cognitive and behavioral functioning.  20 U.S.C. §§ 1414(b), (c).  Moreover, because Cherry Gulch did not provide S.G.'s up-to-date progress reports, treatment/counseling notes, mental health records, and medical information, San Dieguito District lacked sufficient data to determine his "present" needs for assistive technology or issues with sensory integration.  *See* AR 3054–56, 3058–60, 3062–64, 3078–79, AR 3603–04; 20 U.S.C. § 1414(c)(1)(B).  Nor could the District rely on his prior assessments given that his last triennial was from 2015 and his most recent IEP was from March 2017.  *See* AR 3058–60.  As a result, the District explicitly noted in its November 2020 Triennial that it was unaware of whether S.G. received services for assistive technology or occupational therapy.  AR 3525–26.  Thus, as San Dieguito District was unable to interact with S.G. or employ other "technically sound instruments" to assess him in *any* area, including sensory integration and assistive technology needs, the ALJ reasonably found that the District did not procedurally violate the IDEA.  20 U.S.C. §§ 1414(b)(2), (c).

Furthermore, the ALJ also properly accounted for the fact that the District had no reason to suspect that S.G. required assistive technology.  *See Timothy O*, 822 F.3d at 1119–20.  First, when San Dieguito District provided its assessment plan, while S.G.'s parents noted that he would require a sensory assessment, they did not indicate that he would need an assistive technology assessment.  AR 3428–29.  Nor did they raise this issue during the June 19, 2020 IEP meeting.  AR 3892–95.  In fact, the District had no reason to presume that he would require such support given that he was effectively banned from using technology while at Cherry Gulch.  AR 5321–22.  Therefore, there were no "indicators" that this was an area that the San Dieguito District needed to assess.  *Timothy O*, 822 F.3d at 1121.

Accordingly, the Court finds that the ALJ correctly concluded that San Dieguito

District did not procedurally violate the IDEA by failing to assess S.G. in the areas of sensory integration and assistive technology in its November 2020 Triennial given that it (1) was unable to test any of S.G.'s present disability needs and (2) had no reason to suspect that S.G. required assistive technology.  ALJ Order at 16–20.

### 4. Procedural Issue: Assessment Accommodations During COVID-19

S.G. argues that San Dieguito District should have accommodated his inability to provide requested documents and make himself available for an assessment in light of the difficulties posed by the COVID-19 pandemic.  Pl.'s Mot. Summ. J. at 20–21.  He argues that in conducting its November 2020 Triennial, the District could have conducted a file review of available information or traveled to Cherry Gulch at his parents' expense to assess him.  *See id.*  In reaching its conclusion, the Court must evaluate whether the District improperly rejected S.G.'s suggested accommodations or whether the ALJ correctly found that S.G.'s proposals were impracticable and that the District offered an adequate assessment accommodation by offering virtual assessments.

In evaluating whether a student qualifies for special education, school districts must employ "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information."   20 U.S.C. § 1414(b)(2)(A).   These assessments are designed to "provide relevant information that directly assists persons in determining the educational needs of the child."  *Id.* § 1414(b)(3)(C).  These cannot solely rely on a "single measure or assessment" to determine whether the child is qualified for special education services.  *Id.* § 1414(b)(2)(B).  Rather, the school district must "use technically sound instruments" to assess the child's "relative contribution of cognitive and behavioral factors."  *Id.* § 1414(b)(2)(C).  Accordingly, the school district is obligated to (1) review "evaluations and information provided by the parents of the child;" (2) conduct "current classroom-based, local, or State assessments, and classroom-based observations;" and (3) consider "observations by teachers and related services providers."  *Id.* § 1414(c)(1)(A).  Critically, an evaluation must examine a child's "present levels of academic achievement and related developmental needs."  *Id.* § 1414(c)(1)(B).

The Court finds that the ALJ reasonably found that the District appropriately modified its assessment requirements by only requiring virtual participation and requesting up-to-date records over email. ALJ Order at 21–23. As the ALJ recognized, San Dieguito District adapted to the restrictions of the pandemic by (1) only requiring that S.G., his family, and Cherry Gulch participate in interviews and assessments remotely; (2) offering to conduct assessments and observations over Zoom; and (3) communicating about documents over email and the phone. AR 3054–60, 3062–64, 3078–79, 5228–31, 5367–70, 5615–18. In fact, the District repeatedly provided explicit lists of the exact documents it required and copies of the assessments and interview forms that needed to be filled out. AR 3054–56, 3059, 3062–64. These proposed accommodations allowed the District to account for the difficulty of having in-person interactions and other administrative hurdles posed by the pandemic without compromising the integrity of its assessments and S.G.'s ultimate evaluation. *See* 20 U.S.C. § 1414. Critically, while S.G. asserts that these accommodations were insufficient, he does not explain why these documents could not be provided or why he could not participate in an evaluation virtually or in person given his repeated trips home during the pandemic. AR 3252–53, 3257–59, 3264–65, 3268–69, 3275–76.

Contrary to Plaintiff's arguments, the District could neither exclusively review S.G.'s outdated IEP records nor accept his parents' offer to pay for their travel expenses to Cherry Gulch. Principally, Cherry Gulch could not determine S.G.'s eligibility for special education from reviewing his 2017 and prior IEP records, a few cursory conversations with Cherry Gulch staff, a few progress reports, and some records and interviews from NewBridge alone. AR 3054–55, 3520–97, 3893–94. First, as discussed above, San Dieguito District was obliged to use a wide variety of "tools" to assess S.G.'s "present" level of functioning. 20 U.S.C. § 1414(b)(2)(A), (c)(1)(B). The available documents were not only outdated but also limited in what they revealed about his current "cognitive and behavioral factors." *Id.* § 1414(b)(2)(C). For example, the District neither had access to S.G.'s recent mental health records nor knew what accommodations he was receiving. *See*

AR 3520–97. Accordingly, a file review would not accurately reflect S.G.'s present academic and behavioral needs as required under the IDEA. *See* 20 U.S.C. § 1414(b)(2)(C). While Dr. Griffiths testified that a file review could be feasible with a plethora of other information such as extensive up-to-date records and interviews with S.G.'s mental health team, AR 4853–55, the District had none of these things. AR 3520–97. As S.G.'s proposed remedy failed to account for the District's obligations to evaluate his current "functional, developmental, and academic" performance, the ALJ correctly found that this was an insufficient alternative. 20 U.S.C. § 1414(b)(2)(A)

The ALJ also properly determined that S.G.'s offer to pay for the IEP team's travel expenses was not an appropriate accommodation. ALJ Order at 21. Despite S.G.'s arguments otherwise, employees of a local government agency may not accept such funds from parents because they constitute impermissible gifts pursuant to California's Political Reform Act. Cal. Gov't Code § 81000 *et seq.* In 2020, the time in which S.G.'s parents made this offer, the Act explicitly prohibited such employees from accepting payment totaling over $500. Cal. Gov't Code § 89503. Thus, the District responded appropriately in refusing S.G.'s parents' gift and declining to travel to Cherry Gulch. AR 4413–15, 5495–56. Therefore, the ALJ's decision finding this to be an unsuitable accommodation is legally sound.

Accordingly, the ALJ properly concluded that San Dieguito District met its obligation to offer assessment accommodations during the pandemic and that S.G.'s preferred modifications were impermissible.

### 5. Substantive Violation: Failure to Provide Special Education Services in November 2020 Triennial

The Court now turns to S.G.'s argument that the District wrongfully denied his rights as a child with disabilities when it concluded that he did not qualify for special education in its November 2020 Triennial. Pl.'s Mot. Summ. J. at 21–25. In deciding this issue, the Court must evaluate whether the resources available to the District at the time sufficiently indicated that S.G. required special education or whether the ALJ properly concluded that

1    the District lacked enough information to make such a finding.

2        To determine whether a child is qualified for special education services, a school

3    district must evaluate both whether the child has a disability and whether the child qualifies

4    for special education. *L.J.*, 850 F.3d at 1003. Critically, a child with a disability does not

5    always qualify for special education if his or her needs can be met through the general

6    education program. *Id.* In conducting its evaluation of a student's eligibility, school

7    districts are required to (1) gather "relevant functional, developmental, and academic

8    information;" (2) engage in assessments, using a variety of "technically sound

9    instruments;" (3) evaluate the child's cognitive, behavioral, physical, and developmental

10   needs; (4) review a variety of resources, including existing evaluation data, parental insight,

11   classroom observations, and discussions with teachers and related services providers; and

12   (5) understand the child's present levels of academic achievement and functional

13   performance. 20 U.S.C. § 1414.

14       In reviewing whether a child was wrongfully denied special education services, a

15   court must evaluate whether the school district's eligibility determination was "objectively

16   reasonable" or "appropriate" "at the time of the child's evaluation and not from the

17   perspective of a later time with the benefit of hindsight." *Adams v. Oregon*, 195 F.3d 1141,

18   1149 (9th Cir. 1999). Thus, a court must consider what "information reasonably [was]

19   available to the parties" at the time of the evaluation. *L.J.*, 850 F.3d at 1004. Accordingly,

20   courts should "judge" the decision "on the basis of whether it took the relevant information

21   into account, not on whether or not it worked." *Id.* (internal citation omitted).

22       Here, the Court affirms the ALJ's finding that the District lacked sufficient

23   information about S.G.'s current cognitive and behavioral needs to conclude that he

24   required special education when conducting its November 2020 Triennial. ALJ Order at

25   24–27. Because neither Cherry Gulch nor S.G.'s parents made S.G. available to the

26   District, the IEP team could not interview him, observe him in the classroom, nor

27   administer tests to ascertain his disabilities. 20 U.S.C. § 1414(b); AR 3520–97, 3601–04.

28   Despite the District's multiple requests that Cherry Gulch gather this firsthand data on its

behalf, Cherry Gulch was entirely unresponsive.  AR 3062–64, 3078–79.  Accordingly, S.G.'s parents and Cherry Gulch's noncompliance effectively prevented the District from fulfilling its duties to employ a wide variety of tools, including observing S.G. in the classroom environment, to test his cognitive and behavioral functioning.  20 U.S.C. § 1414.

S.G.'s parents and Cherry Gulch's lack of cooperation precluded the District from considering S.G.'s "present levels" of performance from a variety of resources.  *Id.* § 1414(c)(1)(B).  The District repeatedly requested explicit documents from Cherry Gulch, including S.G.'s up-to-date (1) mental health records detailing his treatment plans, progress goals, services, and discharge plan; (2) medical information showing any testing and medications; (3) behavioral information demonstrating his behavioral plans and any disciplinary action he faced; (4) educational information exhibiting his attendance records, grades and transcripts, educational goals and progress, grade level competency, and accommodations and supports; and (5) any information about his standardized testing, plans for his reunification with his parents and transitional needs, and his anticipated release date and recommendations.  AR 3054–60, 3062–04.  However, instead of providing this requested information, Cherry Gulch merely sent S.G.'s report card, attendance report, and April 2020 written progress report—all of which indicated that he was making meaningful academic progress.  AR 3054–55.  While the District's preliminary discussions with Cherry Gulch staff members flagged that S.G. had behavioral issues and some recent outbursts, the District lacked further detail about these incidents and how these problems were being treated.  AR 3892–95.  Furthermore, after these initial conversations, S.G.'s teachers and therapists refused to engage in any further interviews.  AR 3062–64, 3078–79, 3520–97, 3603–04.  Accordingly, the District had no means to access information about S.G.'s current cognitive, behavioral, physical, and developmental performance at Cherry Gulch.  20 U.S.C. § 1414(b)(2)(C), (C)(1)(b)(ii).  Without this foundational data, the District had no basis upon which it could make an accurate determination of whether S.G. still had any disabilities and whether those disabilities required special education.  *See id.*; *L.J.*, 850 F.3d at 1003.

Contrary to Plaintiff's arguments otherwise, the District could not rely on out-of-date records because it needed to assess his *present* levels of academic achievement and functional performance. 20 U.S.C. § 1414(c)(1)(B)(ii). The ALJ correctly determined that S.G.'s historical records and prior IEPs alone could not establish his eligibility for special education. ALJ Order at 24. The IDEA requires that a school district reevaluate students at least once every three years to determine their eligibility for special education. 20 U.S.C. § 1414(a)(2)(b)(ii). As S.G.'s most recent IEP was from 2017 and recent triennial was from 2015, the District was *statutorily required* to reevaluate S.G. to determine his qualifications. *See id.*; AR 3892-95. Furthermore, S.G.'s most recent IEP was not reflective of his current behavioral problems. In 2017, S.G.'s IEP exclusively focused on his learning difficulties due to of his ADHD and generalized anxiety. AR 2125, 2839–62. However, since that time, S.G. had developed significant emotional and behavioral issues, leading to aggressive episodes and violent outbursts, that caused him to leave the public school system in the first place. AR 2950–54, 3208–12, 3390–91. Accordingly, because S.G.'s prior records did not account for these changes, the District could not rely on them in gathering "relevant functional, developmental, and academic information" about S.G. 20 U.S.C. § 1414(b)(2)(A). Therefore, the ALJ reasonably found that these records alone could not provide a foundation for the IEP team to evaluate S.G.'s current disabilities and qualifications for special education. ALJ Order at 25–27; *L.J.*, 850 F.3d at 1003.

Finally, the few pieces of recent information that the District did have all indicated that S.G. was making meaningful academic and behavioral progress. The District learned from NewBridge, S.G.'s first private school after leaving Del Mar District, that the student had generally thrived there, earning A and B grades, without exhibiting any behavioral problems. AR 2876–931, 3893. In fact, NewBridge had reported that S.G.'s only issues of concern were "executive function, self-regulation, and written language development issues." AR 3893. Through its preliminary discussions with Cherry Gulch, the District learned that S.G. was steadily improving. AR 3894. Although the school staff flagged his physical aggression issues, they also emphasized that S.G. was responding very well to the

school's therapeutic curriculum and that he would likely be ready to leave come October 2020.  *Id.*  Moreover, at this time, S.G.'s only formal diagnoses were ADHD and general anxiety disorder.  AR 2950–54.  Given that Cherry Gulch and S.G.'s parents failed to inform San Dieguito District about his performance at Cherry Gulch, the details of his violent outbursts, and his needed accommodations, the District had no means at the time of his Novembre 2020 Triennial to ascertain the extent of S.G.'s disabilities and required special education needs.  AR 3520–97.  As the evidence available to the District at the time demonstrated that S.G. was performing well in school and actively improving his emotional dysregulation and behavioral issues, the District's decision to find him ineligible for special education was objectively reasonable.  *Adams*, 195 F.3d at 1149.  Therefore, the Court affirms the ALJ's conclusion that the District's determination that S.G. was ineligible for special education was "appropriate" given the that it adequately accounted for the limited "information available" to it in rendering its November 2020 Triennial.  ALJ Order at 25–27; *L.J.*, 850 F.3d at 1004.

After reviewing the issues that S.G. raises on appeal, the Court affirms the ALJ's rulings that the District did not violate the IDEA for the reasons identified above.  The Court therefore denies S.G.'s motion for summary judgment to the extent it appeals the ALJ's ruling.  The Court now turns to San Dieguito District's appeal of the ALJ's decision, which contests her finding that the District substantively violated the IDEA in failing to provide S.G. a FAPE between April 2, 2021 and June 11, 2021.

### 6.  Substantive Issue: Denial of a FAPE between April 2, 2021 and June 11, 2021

Next, the Court must examine the District's appeal challenging the ALJ's determination that the District's IEP failed to account for S.G. special education needs between April 2, 2021 and June 11, 2021.  In deciding this issue, the Court must assess (1) whether the placement offered in the District's IEP failed to account for S.G.'s unique needs between April 2, 2021, and June 11, 2021; (2) if not, whether Cherry Gulch was an appropriate placement for S.G. at that time; and (3) if so, whether equitable considerations favor reimbursement.

41

### a.  Denial of a FAPE

First, the Court must evaluate the District's argument that its written IEP, offering placement at New Haven, a private day school in San Diego County, appropriately accommodated S.G.'s behavioral issues between April 2, 2021 and June 11, 2021.  Def.'s Mot. Summ. J. #1.  In coming to this decision, the Court must examine whether the preponderance of the evidence shows that the District's written offer properly accounted for S.G.'s transitional needs during this time period.

In reviewing whether a school district has met its substantive duties under the IDEA, a court must evaluate whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07.  This requires that the school district "(1) address[ed] [this child's] unique needs, (2) provide[d] adequate support services so [he] can take advantage of the educational opportunities, and (3) [been] in accord with the individualized education program." *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1200 (9th Cir. 2017).  "An appropriate public education does not mean the absolutely best or 'potential-maximizing' education for the individual child." *A.O.*, 92 F.4th at 1172.  "Yet an individualized education program must still be appropriately ambitious, and a program that offers merely more than *de minimis* progress violates the IDEA." *Id.*  In sum, the IEP must provide the child with a "meaningful benefit." *Id.*  However, courts should not "critique an IEP with the benefit of hindsight"— rather, they must examine "whether the goals and methods were reasonably calculated to ensure that the child would receive educational benefits at the time of implementation." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1058 (9th Cir. 2012).

Critically, a school district must convey all components of the IEP in "a formal, written, and specific offer of placement." *A.O.*, 92 F.4th at 1169 (citing 20 U.S.C. § 1414(d)(1)(A)(i)).  "This requirement is enforced rigorously because it provides a clear record if disputes arise and because the written offer helps parents decide whether to accept or reject a proposed program." *Id.* (internal citation omitted).  "Regulations provide that the written program must include the projected start date for services and modifications, as

well as the anticipated frequency, location, and duration of those services and modifications." *Id.* (citing 34 C.F.R. § 300.320(a)(7)).

Here, the ALJ correctly concluded that the District's written offer to immediately place S.G. at New Haven failed to reckon with the "unique" transitional needs created by his collective disabilities. ALJ Order at 41–43; *M.C.*, 858 F.3d at 1200. Foremost, the ALJ reasonably found that S.G. required a transition period from April 2, 2021, to June 11, 2021 because the record clearly demonstrates that S.G. needed to mentally prepare before returning home.[12] ALJ Order at 42. First, the record is replete with evidence that S.G. responded poorly to transitions. Both his father and psychiatrist, Dr. Steinberg, testified that he struggled with sudden changes and required adequate notice to settle his expectations. AR 4400–03, 4677–79, 4681. This finding was only further supported by the fact that S.G. had recently been diagnosed with bipolar disorder, confirming his vulnerability to transitions, as voiced by Dr. Steinberg and expert Dr. Griffiths. AR 4677–79, 4681, 4693, 4843–46. Second, at the time of the April 2, 2021 IEP, S.G. was having aggressive episodes, demonstrating that he was not yet equipped to leave Cherry Gulch. AR 3122, 3137, 3390–91, 4400–03, 5136–43. In fact, S.G.'s home visit, in which he practiced regulating his emotions and actions while at home, was canceled as the staff thought he was not ready to be in that environment. AR 3137, 3390–91. These outbursts motivated the Cherry Gulch staff to postpone S.G.'s release date to June 11, 2021,

---

[12] The District argues that the ALJ's request for transition services was unfounded as it was not requested or contemplated by S.G.'s parents or the IEP team. Def.'s Mot. Summ. J. #1 at 6. However, the Ninth Circuit has clearly established that a "school district cannot blame a parent for its failure to ensure meaningful procedural compliance with the IDEA." *A.O.*, 92 F.4th at 1171 (internal citation omitted). Thus, the fact that S.G.'s parents could have more clearly requested a transition period does not excuse the District of its obligation to provide requisite services. *See id.* at 1172 (explaining that the fact that student's parents could have asked more questions does not excuse the school districts "failure to fulfill its affirmative obligation[s]").

22-CV-00450

reasoning that this was necessary for S.G.'s progress and his family's safety.[13]  AR 5136–
43; *see Covington v. Yuba City Unified Sch. Dist.*, 780 F. Supp. 2d 1014 (E.D. Cal. 2011)
(finding that school district's failure to seriously consider student's behavioral needs, given
"increasingly defiant and resistant to redirection or intervention," denied the student his
entitled special education benefits).  Finally, the record clearly indicates that being home
was a major trigger for S.G.  AR 3208–12, 2950–54.  While he was able to manage his
emotions at school, he was unable to regulate whatsoever at home, erupting into violent
outbursts, which is what prompted his parents to place him at Cherry Gulch in the first
place.  AR 3208–12, 2950–54. Critically, the record demonstrates that the District itself
was well aware of S.G.'s difficulties with transitioning.  In fact, the District's own
evaluation highlighted that S.G.(1) struggled with transitions and changing circumstances
due to his inability to regulate his emotions and expectations; (2) was triggered when at
home, which frequently incited aggressive episodes; and (3) had recently had outbursts and
engaged in violent behavior, requiring Cherry Gulch to postpone his departure date.  AR
3163, 3656, 3681, 3742–43.

Despite S.G.'s clear need for transitional support, San Dieguito District's IEP failed
to provide these services.  As the ALJ noted, the IEP as written offered S.G. *immediate*
placement at New Haven, beginning on April 2, 2021, requiring the S.G. *immediately*
return home in order to receive its services.  ALJ Order at 39–40; AR 3179–81.  Although
the IEP indicated that S.G. would have access to "Wraparound Services" for 120 minutes
a week, the IEP did not indicate what these were or what purposes they served.  AR 3181.
Because the District's IEP placed S.G. immediately back in the environment that was the
source of his destructive behavior without notice, despite Cherry Gulch's determination

---

[13] The District argues that S.G. was ready to leave Cherry Gulch by March 2021 because his social
worker, Mr. Hale, stated that he would be in the final phase of the Hero's Journey, Emotional Growth
Curriculum by then. Def.'s Mot. Summ. J. #1 at 14 (citing AR 3156).  This fails to account for the later
postponement in S.G.'s release date due to his behavioral issues and thus, is not persuasive.  AR 5136–
43.

that he was not ready for such a change, the ALJ reasonably concluded that the District's recommended placement failed to meet S.G.'s particular needs. ALJ Order at 39–43.

Critically, the ALJ correctly disregarded the District's discussion of potentially extending S.G.'s time at Cherry Gulch. ALJ Order at 42. Although the IEP team expressed during the April 2, 2021 meeting that it may be possible to do some "overlapping therapeutic collaborations" with Cherry Gulch if S.G. was not ready to return home quite yet, they failed to put this option into writing. AR 3185. As an IEP must convey all components in "a formal, written, and specific offer of placement," the ALJ aptly concluded that she could not consider this in her calculus. *A.O.*, 92 F.4th at 1169. Accordingly, the Court affirms the ALJ's finding that the District's IEP did not provide S.G. a transition period as its written offer required that he instantly return home. ALJ Order at 41–43.

Finally, contrary to the District's argument otherwise, this conclusion does not undermine the ALJ's determination that S.G. would be ready to return home by June 11, 2021. Def.'s Mot. Summ. J. #1 at 14. The ALJ reasonably concluded that this two-month transition period from April 2, 2021, to June 11, 2021 would suffice to mentally prepare S.G. to depart Cherry Gulch. ALJ Order at 43–45. She reasoned that because S.G. would be ready by then to transition to Novitas, a less restrictive environment, that he would likely be equally equipped to transfer to New Haven instead. *Id.* The ALJ recognized that New Haven, when coupled with its Wraparound Services, would offer similar support and services to what Novitas could provide. *Id.* As there was no evidence that S.G. required a residential placement as a part of stepping down from Cherry Gulch, the ALJ's conclusion that New Haven would be an adequate substitute was well supported. *Id.*

Therefore, because the District's written IEP failed to account for S.G.'s needed transition period, the ALJ correctly found that San Dieguito District failed to offer him a free appropriate public education between April 2, 2021, and June 11, 2021.

### b. Appropriate Placement

Next, the Court must assess the District's argument that Cherry Gulch was not an

appropriate private placement for S.G. during those months because it did not offer him an official IEP.  Accordingly, the Court will examine whether the ALJ reasonably found that Cherry Gulch was well suited for S.G.'s unique behavioral issues even though it did not provide formal special education services.

If a court finds that a school district has not met its responsibility to satisfy a student's special educational needs and that the child's alternative placement in private school is "appropriate," "a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment." *S.L. ex rel. Loof v. Upland Unified Sch. Dist.*, 747 F.3d 1155, 1159 (9th Cir. 2014) (citing 34 C.F.R. § 300.148(c); 20 U.S.C. § 1412(a)(10)(C)(ii)).  In evaluating whether the private school placement was "appropriate," "parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Id.* (internal citation omitted).  Instead, "[t]hey need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.* (internal citation omitted).  Moreover, the private school need not meet the strict requirements of a state's definition of special education services to qualify as an "appropriate education." *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 14 (1993) (finding that the fact that two of the faculty members were not state-certified in special education and that the school did not develop IEP does not bar it from constituting an "appropriate" education for the child).

Here, the Court concludes that the ALJ properly found that Cherry Gulch was an appropriate placement for S.G. for this period because the school offered an education plan centered on helping S.G. with emotional regulation and preparing to return home.  The evidence clearly demonstrates Cherry Gulch was well suited to S.G.'s needs given that he received programming focused on "self-awareness, distress tolerance, flexibility and accountability," with the specific aim of managing his emotions and behavior at home to avoid violent eruptions.  AR 2950–54.  Within the residential framework, he worked on managing his expectations, employing self-soothing skills, and improving his

46

22-CV-00450

communication and relationships with his parents.  In addition to family therapy, S.G. was preparing to return home by participating in "home visits" to help him practice his skills in that environment.  *Id.*  Moreover, Cherry Gulch had adapted its timeline and instruction to accommodate S.G.'s new diagnosis of bipolar disorder and rise in negative behavior, illuminating that it was well suited to meet S.G.'s unique needs.  AR 3137, 3390–91, 5136–43; *cf. Covington*, 780 F. Supp. 2d at 1024 (finding inappropriate private placement for student's behavioral needs as the school lacked individualized behavioral supports).

Despite the District's arguments to the contrary, the ALJ need not have discounted Cherry Gulch's appropriateness because its educational programs did not formally qualify as "special education services and supports" or provide a formal IEP.  Def.'s Mot. Summ. J. #1 at 10.  As the Supreme Court has made abundantly clear, a school need not qualify as state special education in order to constitute an "appropriate education."  *Carter*, 510 U.S. at 14 ("[I]t hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place.").   Because Cherry Gulch's educational and therapeutic programming was specifically targeted at managing S.G.'s emotional and mental disabilities, including his bipolar disorder, the ALJ reasonably found that Cherry Gulch was an appropriate placement for the two months.  ALJ Order at 57; AR 2950–54.

### c.  Reimbursement

Finally, the District asks the Court to consider whether the unreasonable conduct of S.G.'s parents warrants a reduction or denial of reimbursement of the two-moths of Cherry Gulch tuition and related expenses.

If a court finds that a school district has failed to provide a child a satisfactory IEP, "[p]arents have an equitable right to reimbursement for the cost of providing an appropriate education."  *Anchorage.*, 689 F.3d at 1058.   "[R]eimbursement for such expenses is appropriate only if (1) the school district's placement violated the IDEA, and (2) the alternative placement was proper under the statute."  *Id.* at 1059 (citing *Carter*, 510 U.S.

at 15). "If both criteria are satisfied, the district court then must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether and how much, reimbursement is appropriate." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (quoting *Carter*, 510 U.S. at 15–16).

Given the contradictory or incomplete testimony in the administrative record concerning S.G.'s parents' cooperation during the IEP process, their intent to enroll S.G. in the District's placement, and the accommodations provided at High Tech High, the Court sets an evidentiary hearing to determine whether a reduction or denial of reimbursement is appropriate here. *Compare* AR 4444, 4460, 5488–96, 5548, 5550 *with* 4443, 4474–76, 5218–25, 5307–11, 5436, 5509, 5551, 5626–31. Accordingly, the Court sets the evidentiary hearing to resolve these issues.

In sum, the Court upholds the ALJ's determination that San Dieguito District failed to meet its substantive duties under the IDEA to provide S.G. an appropriate placement between April 2, 2021, and June 11, 2021, in its IEP and that Cherry Gulch was an appropriate placement for S.G. during that time. Accordingly, the Court denies San Dieguito District's first motion for summary judgment and sets an evidentiary hearing for November 7, 2024, at 9:30 a.m.

**C. Section 504 of the Rehabilitation Act**

Finally, the Court turns to the parties' respective motions for summary judgment on S.G.'s two Section 504 claims. Def.'s Mot. Summ. J. #2; Pl.'s Mot. Summ. J. at 6, 10; Dkt. 100 ("Pl.'s Opp'n"). In addressing these motions, the Court will examine whether S.G. has raised a triable issue that San Dieguito District intentionally discriminated against him, whether by malice or deliberately indifference to his mental health needs.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In order to establish a claim under Section 504, a plaintiff must show that "(1) he is a qualified

individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 377 (9th Cir. 2021) (internal quotation marks and citations omitted).   In order to recover damages under Section 504, "plaintiffs must prove a *mens rea* of 'intentional discrimination." *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008).  A plaintiff can establish "intentional discrimination" either by proving that a defendant acted with "discriminatory animus" or "deliberate indifference." *Id.* at 938. "'Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood.'" *Id.*  The plaintiff can establish the defendant's knowledge by showing that she "alerted the public entity to [her] need for accommodation" or that her "need for accommodation" was obvious. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).  When an entity is on notice of the need for accommodation, it "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation." *Id.*  A failure to act is not mere negligence, such as overlooking a duty to act or a complaint. *Id.*  Rather, the plaintiff must show that the defendant acted with "deliberateness." *Id.*

Here, S.G. argues that that the four following incidents evince San Dieguito District's discriminatory intent against him: the District's failure to (1) recognize Cherry Gulch as a California Licensed Residential Treatment Center; (2) to find him eligible for special education for purposes of his November 2020 Triennial; (3) to provide him with assessment modifications due to the challenges raised by the COVID-19 pandemic; and (4) to acknowledge Cherry Gulch's cooperative assistance in preparing for S.G.'s November 2020 Triennial.  Pl.'s Opp'n.  As discussed below, each of these fail to create a triable issue that the District did in fact act with animus or deliberate indifference toward S.G.

First, while S.G. is correct that the District frequently referred to Cherry Gulch as an

"out of state private boarding school," he fails to explain how this suggests animus or deliberate indifference. Pl.'s Opp'n at 3; *Mark H.*, 513 F.3d at 938. The student appears to argue that this moniker did not accord Cherry Gulch the due respect and recognition it deserves as a therapeutic institution. Pl.'s Opp'n at 3. But, given that Cherry Gulch is indeed an out-of-state private school, the Court declines to conclude that the use of a factually accurate term, without more, creates a triable issue of whether the District acted with discriminatory intent or deliberate indifference toward S.G.'s rights and welfare. *See Mark H.*, 513 F.3d at 925.

Second, S.G. does not explain how the District's determination that he was ineligible for special education in its November 2020 Triennial demonstrates discriminatory intent given that the District was prevented from conducting assessments and lacked necessary documentation. As discussed above, the San Dieguito District's decision was objectively reasonable given that (1) it could not evaluate S.G. himself; (2) it lacked up-to-date records reflecting S.G.'s current needs; (3) it could not rely on historic documentation of S.G.'s disabilities given its legal obligation to reassess him; and (4) the recent records did not demonstrate a need for special education. *See supra*, Section III.B.5. Since the District could not effectively evaluate S.G. due to his parents' and Cherry Gulch's failure to comply, the Court cannot find that this legitimate determination raises a triable issue of whether San Dieguito District intended to cause S.G. harm. *See supra*, Section III.B.5; *Mark H.*, 513 F.3d at 925. S.G. raises no factual disputes pertinent to the above appeal or for purposes of his claims under the Rehabilitation Act. Rather, S.G. contests the legal conclusion that the information available to the District could not establish his eligibility for special education. *See* Pl.'s Mot. Summ. J.; Pl.'s Opp'n.

Moreover, the undisputed facts belie the conclusion that the District failed to act despite its knowledge that S.G.'s rights were at stake. *See Duvall*, 260 F.3d at 1139. Rather, the undisputed evidence demonstrates that San Dieguito District acted promptly and proactively in responding to S.G.'s initial due process request in May 2020, notifying him of his rights, holding IEP meetings, preparing an assessment plan, and attempting to

gather relevant information and data.  AR 3020–21, 3054–60, 3602–04, 3078–79, 3892–97, 3520–97.  The undisputed facts show that District repeatedly tried to assess S.G. and obtain necessary records about his current functioning as required by law despite the myriad of obstacles in its way.  AR 3054–60, 3602–04, 3078–79, 3520–97.  Moreover, when the District did have access to the information it needed to properly conduct its evaluation in April 2021, it provided a thorough and exhaustive IEP accommodating S.G.'s various needs.  AR 3652–3862.  Although S.G. may disagree with the outcome of these findings, he points to no facts in the record demonstrating that the District ignored his known needs.  *See* Pl.'s Mot. Summ. J.; Pl.'s Opp'n.

Third, the District's refusal to accommodate S.G. by either (1) flying its IEP team to Idaho to assess him or (2) finding him eligible for special education services based on outdated records fails to raise a triable issue that the District had discriminatory intent. First, the Districts' refusal to violate ethical and legal requirements by accepting money to fly to Idaho to evaluate S.G. does not evidence animus or indifference.  Second, S.G.'s assertion that a file review was sufficient does not raise a triable issue that the District acted with malice or knew of his need for an accommodation and then deliberately ignored that need. *See Mark H.*, 513 F.3d at 938.  As discussed above, the undisputed facts demonstrate that the District did offer suitable assessment accommodations by (1) only requiring that S.G., his family, and Cherry Gulch participate in interviews and assessments remotely; (2) offering to conduct assessments and observations over Zoom; and (3) communicating over email and the phone.  *See Supra*, Section III.B.4.  Accordingly, the undisputed facts show that the District informed S.G. that it could not exclusively rely on this information in order to meet its legal duties under the IDEA and that, despite S.G.'s noncompliance, it continued its efforts to obtain the evidence it needed in order to evaluate his special education eligibility and provide him with the services he needed.  *See Supra*, Section III.B.4; *Duvall*, 260 F.3d at 1139.  Given these undisputed facts, S.G. has failed to raise a genuine issue of material fact as to whether the District acted with animus or deliberate indifference to his needs.  *See Mark H.*, 513 F.3d at 925.

Lastly, S.G.'s contention that San Dieguito District disregarded the information that Cherry Gulch offered is entirely unsupported by the record.  In making this argument, Plaintiff points to no specific input—whether conversations or records—that Cherry Gulch provided but the District ignored.  *See* Pl.'s Mot. Summ. J.; Pl.'s Opp'n.  To the contrary, the undisputed evidence establishes that the District acknowledged and weighed the few interviews and documents Cherry Gulch gave in rendering its November 2020 Triennial. AR 3520–97.  During its initial IEP meeting, the District did in fact acknowledge Cherry Gulch's minimal participation.  AR 3892–95.  However, the District frequently stressed that this alone would not permit it to proceed with a thorough and effective evaluation.  AR 3058–60, 3078–79, 3602–04, 3892–95; *see Mark H.*, 513 F.3d at 925.  S.G. does not point to any instances in which the District disregarded information provided by Cherry Gulch and thus, fails to raise a triable issue that the District acted with malintent or deliberate indifference.  *See* Pl.'s Mot. Summ. J.; Pl.'s Opp'n.  In addition, given the undisputed facts regarding the District's repeated attempts to collect the requisite documentation and to assist and collaborate with Cherry Gulch, there is no basis for S.G.'s argument that San Dieguito District deliberately failed to act, let alone that it did so with indifference to his needs.   AR 3055–60, 3078–79, 3602–04, 3892–95; *see Duvall*, 260 F.3d at 1139. Accordingly, the Court finds that S.G.'s theories of discriminatory intent are unsupported by any record evidence given that the undisputed facts show that the District diligently engaged with S.G.'s parents and Cherry Gulch in an attempt to evaluate the student and provide him with the support he needed.  *See Supra*, Section III.B.  Because S.G. has not identified any other evidence in the record supporting the District's alleged discriminatory intent, he has failed to raise a genuine issue of material fact as to this critical element.

In sum, as S.G. has not pointed to any evidence in the record that supports his claims that the District intentionally discriminated against him, the Court grants the District's motion and denies S.G.'s motion for summary judgment on this basis.  *See Mark H.*, 513 F.3d at 925.   Therefore, the Court grants the District's second motion for summary judgment and denies in part S.G.'s motion for summary judgment on these grounds.

# IV.   CONCLUSION

For the reasons stated above, the Court DENIES S.G.'s motion for summary judgment, Dkt. 86, and GRANTS IN PART AND DENIES IN PART the District' first motion for summary judgment on its appeal of the California Office of Administrative Hearings, Dkt. 83, and GRANTS the District's second motion for summary judgment on S.G.'s Section 504 claims, Dkt. 93.   The Court also SETS an evidentiary hearing to determine whether a reduction or denial of reimbursement is appropriate for November 7, 2024, at 9:30 a.m.

**IT IS SO ORDERED**.

Dated: September 30, 2024

_____
Honorable Jinsook Ohta
United States District Judge